IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN HESTER-CARRILLO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 23-2134 |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, GOVERNOR | : | |
| SHAPIRO, and ATTORNEY GENERAL | : | |
| HENRY, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                    September 29, 2023

The plaintiff, who is proceeding *pro se*, has sought leave to proceed *in forma pauperis* in this action where she appears to claim in her complaint that a state, its governor, and its attorney general were responsible for numerous issues that she has experienced over the past year. Many of these issues appear to relate to law enforcement officers having obtained and viewed her driver's license and, thereafter, documented what she claims is confidential, inappropriate, and inaccurate information about her in the Division of Motor Vehicles' database. The plaintiff appears to believe that this information caused her to be evicted from her rental property, created difficulties for her when she attempted to find new places to stay, and resulted later in the impounding of her vehicle, which she has been unable to have returned to her. Due to the loss of her residence and vehicle, the plaintiff alleges that she has been forced to stay at various shelters and, while there, has been sexually assaulted. The plaintiff also alleges that certain of these shelters and a few community service organizations are part of a conspiracy to, *inter alia*, obtain and store her and other similarly

situated individuals' DNA, harm or alter that DNA, and conduct experiments on them and their DNA.

With regard to her asserted causes of action, the plaintiff raises claims for unlawful searches and seizures, as well as an invasion of privacy, in violation of the Fourth and Fourteenth Amendments to the United States Constitution. She attempts to assert claims based on the Health Insurance Portability and Accountability Act ("HIPAA") and the Driver's Privacy Protection Act ("DPPA"), based on the alleged improper access to her personal health information and driver's license information, respectively. For relief, the plaintiff seeks monetary damages and injunctive relief in the nature of, *inter alia*, correcting any damage done to her DNA and removing any unfavorable information from her driver's license record.

As explained in more detail below, while the court will grant the plaintiff leave to proceed *in forma pauperis*, the court will also dismiss the complaint in its entirety. More specifically, the court will dismiss with prejudice any claims the plaintiff has against the Commonwealth of Pennsylvania pursuant to the DPPA and HIPAA, as well as any claims where she is seeking monetary damages. The court will also dismiss with prejudice all the plaintiff's claims possibly based on her factually frivolous allegations regarding the purported conspiracy relating to her DNA and experiments conducted on her. For all other claims, the court will dismiss them without prejudice to the plaintiff filing an amended complaint to the extent she can cure the defects in those claims that the court has identified in this memorandum opinion.

## I.     ALLEGATIONS AND PROCEDURAL HISTORY

The *pro se* plaintiff, Susan Hester-Carrillo, commenced this action by filing an application for leave to proceed *in forma pauperis* and a complaint on June 1, 2023. *See* Doc. Nos. 1, 2. Unfortunately, the *in forma pauperis* application lacked sufficient information to allow this court

to determine whether the plaintiff had the means to pay the fees to commence this case. As a result, the court entered an order on June 14, 2023, which, *inter alia*, (1) denied the *in forma pauperis* application without prejudice and (2) required the plaintiff to resubmit an application (or remit the $402 fee) within 30 days of the entry of the order. *See* June 14, 2023 Order at 1–2, Doc. No. 4. The plaintiff timely responded to the court's order by filing a new *in forma pauperis* application ("IFP Application") on July 11, 2023. *See* Doc. No. 5.

As for the complaint, the plaintiff names as defendants: (1) the Commonwealth of Pennsylvania; (2) Governor Josh Shapiro; and (3) Michelle Henry, who is identified as the Attorney General.[1] *See* Compl. at ECF pp. 1–2. The plaintiff also identifies two general causes of action in the complaint.

First, the plaintiff asserts that the "State of Pennsylvania violated [her] **constitutional right to privacy**" under 18 U.S.C. § 2721(a)(2). *Id.* at ECF p. 5. The plaintiff contends that in accordance with "this constitutional protection," police officers in Pennsylvania must have "probable cause or reasonable suspicion to require [her] driver's license." *Id.* at ECF pp. 5–6.

For the factual background of this claim, the plaintiff avers that she was referred to an organization called Peaceful Knights in December 2022 for assistance with transitional housing for low-income individuals in Carbon County.[2] *See id.* at ECF p. 5. However, on December 12, 2022, an individual named Angie Schoenberger "evicted" the plaintiff despite her having paid Ms. Schoenberger rent from December 11, 2022, through December 18, 2022. *Id.* In response to being "evicted," the plaintiff called the Lehighton Police on December 12, 2022, to request a police

---

[1] Although these defendants are separately noted in the caption of the complaint, *see* Compl. at ECF p. 1, Doc. No. 2, the Commonwealth of Pennsylvania and Governor Shapiro are listed together as defendant no. 1 in the portion of the form complaint where the plaintiff was instructed to provide information for each named defendant. *See id.* at ECF p. 2. As a result, it is unclear whether the plaintiff intended to sue both the Commonwealth of Pennsylvania and Governor Shapiro. Nevertheless, the court will liberally construe the complaint as asserting claims against both the Commonwealth of Pennsylvania and Governor Shapiro.

[2] The plaintiff does not identify the source of the referral.

escort so she could "remove [her] belongings from the housing." *Id.* When they arrived, the "police officers took [her] driver's license information and recorded [her] vulnerable status in the DMV database." *Id.* The plaintiff asserts that "[t]his was the beginning of the defamation of [her] character and resulting loss of reputation" that ensued "throughout the winter by police officers and other government employees in Pennsylvania." *Id.*

Since "the Pennsylvania DMV profiled [her] license," the plaintiff alleges that she has "had problems with police corruption and criminal harassment by government employees" throughout Pennsylvania. *Id.* at ECF p. 6. For example, the plaintiff states that a week after the "profiling incident," "Police Officer Martin" approached her car while she was sitting in a parking lot and asked her for her driver's license.[3] *Id.* Although she initially refused the request because the officer "did not have probable cause," Officer Martin told the plaintiff he would arrest her if she did not provide her identification. *See id.* When the plaintiff showed Officer Martin her driver's license, Officer Martin "ran a background check and recorded more disparaging information about [her] vulnerable status into [her] DMV record." *Id.* However, the plaintiff also states that when Officer Martin returned the license to her, he said she had "a clean record with no cause for reasonable suspicion." *Id.*

Regarding this privacy claim, the plaintiff also references HIPAA as a basis for her claim, asserting that "federal law requires the protection of sensitive patient health information from being disclosed." *Id.* The plaintiff alleges that in December 2022, "staff from several government-funded organizations and police officers . . . recorded highly restricted personal information and private medical information into the DMV and other databases." *Id.* She further alleges that

---

[3] "Police Officer Martin" is not identified as a defendant, and the plaintiff has not specifically identified the law enforcement agency that employs him.

"government-funded organizations"[4] conspired and used her "private medical information to access [her] DNA and the DNA of other homeless people" for human trafficking, and the "use of illegal medical devices to manufacture pharmaceuticals for Johnson and Johnson and Baxter pharmaceuticals." *Id.*

Second, the plaintiff asserts that the "State of Pennsylvania violated [her] 4th Amendment right to be free from unreasonable search and seizure of [her] personal belongings and privately-owned vehicle on December 19, 2022." *Id.* at ECF p. 7. The plaintiff alleges that after DMV records recorded her location and vulnerable status at the YMCA, her car was illegally seized and towed from the parking lot of a public library in Allentown, Pennsylvania "without any due process or reasonable suspicion of a crime having been committed." *Id.* During the seizure, the plaintiff was in her "legally parked vehicle" when a "Police Department tow truck slammed into [her] car." *Id.* The plaintiff claims to have then showed Officer Martin her public library card and vehicle registration, and although Officer Martin "confirmed that there was no reason to tow [her] car based on the information that he viewed," he allegedly told her that the "Allentown Public Library was not 'public.'" *Id.*

Between December 19, 2022, and February 3, 2023, the plaintiff attempted to ascertain the location of her vehicle by making several phone calls to the police department.[5] *See id.* She was unsuccessful because the police department she contacted refused to disclose the location of her vehicle. *See id.* Then, in January 2023, the plaintiff received a letter from the police department advising her that her vehicle would be sold at an auction if she "did not pick up the vehicle within

_____

[4] The plaintiff identified the "government-funded organizations" as: (1) the YMCA; (2) Bethlehem Emergency Shelter; (3) Daybreak; and (4) Ripples Community, Inc. *See* Compl. at ECF p. 6. She alleges that these organizations "conspired with Street Medicine, a division of the Lehigh Valley Health Network and affiliated hospitals" to use her private medical information to access her DNA. *Id.*
[5] The plaintiff does not specifically identify which police department she called.

30 days and pay the entire towing and impoundment fee." *Id.* at ECF p. 8. The plaintiff asserts that after months of being unable to recover her car, Chevrolet repossessed it using an "ONSTAR locator device and all of [her] private property had been searched and seized without probable cause by police officials." *Id.*

Following the seizure of her vehicle, the plaintiff has been forced to stay in emergency shelters in Lehigh and Northampton Counties and has been sexually assaulted "by more than one black person[,] result[ing] in sever personal injury and loss of [her] reputation." *Id.* The plaintiff also avers that she was charged over $4,000 by the unidentified police department in connection with the illegal seizure, and her credit rating has been destroyed. *See id.* at ECF p. 9. She contends that the defamation she has endured has resulted in the denial of shelter at the YMCA in Allentown as well as the denial of housing assistance by service organizations in Hazelton, Lehighton, Hamburg, Reading, and Allentown because "[a]ll these organizations reviewed [her] highly restricted personal information recorded in the DMV database without authorization." *Id.* at ECF pp. 8–9. The plaintiff also contends that the loss of her reputation has resulted in "loss of income from employment" because when potential employers conduct final background checks using her driver's license and social security number, they find "disparaging remarks" recorded by police in the DMV database. *Id.* The plaintiff avers that the "State of Pennsylvania does not comply with the [United States] Constitution's protection of a private citizen's right to privacy and right to be free from unreasonable search and seizure of private property." *Id.* at ECF p. 9.

The court notes that although the plaintiff makes additional allegations of personal injury, those allegations are incredulous. For purposes of this opinion, the court identifies seven of them. First, the plaintiff alleges that during her time at the YMCA and Bethlehem Emergency Shelter ("BES"), she was stalked by a man named Michael and a woman named Wanda, who

"contaminate[d her] DNA with deadly viruses" and bacteria. *See id.* at ECF pp. 9–11. Second, the plaintiff alleges that her abdomen and buttocks were inserted with "illegal electronic or medical devices," and avers that the illegal medical device inserted into her abdomen is known on the street as a "SPIDER." *Id.* at ECF pp. 10–11. Third, the plaintiff alleges that she has been harassed, threatened, and mentally injured by staff at the YMCA shelter, BES, the Ripple Church, Inc. ("RCI"), and "Street Medicine." *Id.* at ECF p. 10. Fourth, the plaintiff avers that she was a "victim of human trafficking by a pastor at RCI and "suffered numerous attempts to sell [her] original DNA to drug cartels . . . [and] an undercover FBI agent." *Id.* Fifth, the plaintiff believes that "some of [her] original DNA is currently being stored illegally in a freezer below locations" of the service organizations listed in the complaint. *Id.* Sixth, the plaintiff asserts that the YMCA, BES, RCI, and Daybreak have been "conspiring with 'Street Medicine of the Lehigh Valley Network' to supply human DNA to Johnson and Johnson and Baxter pharmaceuticals for the purpose of conducting medical experiments on human subjects without consent or compensation." *Id.* Seventh, and finally, the plaintiff avers that a person named "Peggy," and other Daybreak staff, accessed her personally identifiable information in order to "contaminate [her] DNA with deadly bacteria, . . . injure [her] spine and legs while [she] was taking a shower, . . . repeatedly commit financial fraud . . . and even attempted to access the private medical information of [her] genetic descendants in order to injure them as well." *Id.* at ECF p. 12.

Based on these allegations as summarized by the court, the plaintiff seeks the following forms of relief: (1) the return of all her original DNA without harm to her DNA; (2) the reunification of her original DNA with her original body by a third-party medical professional of her choosing; (3) payment in the amount of $4,169.52 by the Pennsylvania government for towing and impoundment fees that resulted from the illegal seizure of her vehicle; (4) punitive damages

in the amount of $4 million against the Commonwealth of Pennsylvania for the illegal search and seizure of her vehicle; (5) payment for the safe removal of any electronic devices inserted into her body; (6) payment for the repair of her injured DNA and return of her original DNA by a service-provider of her choosing; (7) punitive damages in the amount of $50 million against the Commonwealth of Pennsylvania for violations of her right to privacy, including allowing the use of illegal medical devices in homeless shelters and failing to monitor Street Medicine inside government-funded service organizations; and (8) removal of any disparaging remarks from her DMV record. *See id.* at ECF p. 13. Along with these demands, the plaintiff attached a single-page letter exhibit to the complaint indicating that she owes $13,506.86 under the terms of her contract resulting from the repossession and sale of her 2017 Buick Verano on March 9, 2023. *See id.*, Ex. A at ECF p. 1, Doc. No. 2-1. It appears that the plaintiff circled the amount of $4,169.52 incurred for repossession and transport of her vehicle, which she contends are the "[f]ees charged by Police Department to [her] Chevrolet account." *Id.*

## II.   DISCUSSION

### A.   The IFP Application

Regarding applications to proceed *in forma pauperis*,

> any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor.

28 U.S.C. § 1915(a)(1). This statute

> "is designed to ensure that indigent litigants have meaningful access to the federal courts." *Neitzke v. Williams,* 490 U.S. 319, 324, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Specifically, Congress enacted the statute to ensure that administrative court costs and filing fees, both of which must be paid by everyone else who files a lawsuit, would not prevent indigent persons from pursuing meaningful litigation. *Deutsch*[ *v. United States*, 67 F.3d 1080, 1084 (3d Cir. 1995)].  Toward this end, §

> 1915(a) allows a litigant to commence a civil or criminal action in federal court in [sic] *forma pauperis* by filing in good faith an affidavit stating, among other things, that he is unable to pay the costs of the lawsuit. *Neitzke,* 490 U.S. at 324, 109 S.Ct. 1827.

*Douris v. Middletown Twp.*, 293 F. App'x 130, 131–32 (3d Cir. 2008) (per curiam) (footnote omitted).

The litigant seeking to proceed *in forma pauperis* must establish that the litigant is unable to pay the costs of suit. *See Walker v. People Express Airlines, Inc.*, 886 F.2d 598, 601 (3d Cir. 1989) ("Section 1915 provides that, in order for a court to grant *in forma pauperis* status, the litigant seeking such status must establish that he is unable to pay the costs of his suit."). "In this Circuit, leave to proceed *in forma pauperis* is based on a showing of indigence. [The court must] review the affiant's financial statement, and, if convinced that he or she is unable to pay the court costs and filing fees, the court will grant leave to proceed *in forma pauperis*." *Deutsch*, 67 F.3d at 1084 n.5 (internal citations omitted).

Here, after reviewing the IFP Application, it appears that the plaintiff is unable to prepay the fees to commence this civil action. Therefore, the court will grant her leave to proceed *in forma pauperis*.

## B.    Standard of Review – Screening of Complaint Under 28 U.S.C. § 1915

Because the court has granted the plaintiff leave to proceed *in forma pauperis*, the court must engage in the second part of the two-part analysis and examine whether the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or asserts a claim against a defendant immune from monetary relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)–(iii) (providing that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-- . . . **(B)** the action or

appeal—**(i)** is frivolous or malicious; **(ii)** fails to state a claim on which relief may be granted; or **(iii)** seeks monetary relief against a defendant who is immune from such relief").

A complaint is frivolous under section 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact." *Neitzke*, 490 U.S. at 325, is legally baseless if it is "based on an indisputably meritless legal theory," *Deutsch*, 67 F.3d at 1085, and is factually baseless "when the facts alleged rise to the level of the irrational or the wholly incredible." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). The use of the term "frivolous" in section 1915 also "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." *Neitzke*, 490 U.S. at 325. Thus, section 1915 accords judges "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless[,]" including claims that describe "fantastic or delusional scenarios." *Id.* at 327.

As for whether a complaint is malicious,

> [a] court that considers whether an action is malicious must, in accordance with the definition of the term "malicious," engage in a subjective inquiry into the litigant's motivations at the time of the filing of the lawsuit to determine whether the action is an attempt to vex, injure or harass the defendant.

*Id.* at 1086. "[A] district court may dismiss a complaint as malicious if it is plainly abusive of the judicial process or merely repeats pending or previously litigated claims." *Brodzki v. CBS Sports*, Civ. No. 11-841, 2012 WL 125281, at *1 (D. Del. Jan. 13, 2012).

Concerning the analysis under section 1915(e)(2)(B)(ii), the standard for dismissing a complaint for failure to state a claim pursuant to this subsection is identical to the legal standard used when ruling on motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999) (applying Rule 12(b)(6) standard to dismissal for failure to state claim under section 1915(e)(2)(B)). Thus, to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556 (citation omitted).

In addressing whether a *pro se* plaintiff's complaint fails to state a claim, the court must liberally construe the allegations set forth in the complaint. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) ("At this early stage of the litigation, we accept the facts alleged [in the *pro se*] complaint as true, draw all reasonable inferences in [the *pro se* plaintiff's] favor, and ask only whether that complaint, liberally construed, . . . contains facts sufficient to state a plausible . . . claim." (citation, internal quotation marks, and all original alterations omitted)); *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) ("We construe Vogt's pro se filings liberally. This means we remain flexible, especially 'when dealing with imprisoned pro se litigants' like Vogt." (internal citations omitted) (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013))); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a *pro se* litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Yet, conclusory allegations will not suffice. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

Additionally, when construing a *pro se* plaintiff's complaint, the court should always "'apply the relevant legal principle even when the complaint has failed to name it.'" *Vogt*, 8 F.4th at 185 (quoting *Mala*, 704 F.3d at 244). However, *pro se* litigants "'cannot flout procedural rules— they must abide by the same rules that apply to all other litigants.'" *Id.* (quoting *Mala*, 704 F.3d at 245).

## C.      Screening of Claims in Complaint

In the complaint, the plaintiff generally asserts that the defendants violated her rights under the United States Constitution and is seeking relief for those violations under 42 U.S.C. § 1983. This statute provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. When attempting to establish a claim under section 1983, a plaintiff must allege and prove that a "person" deprived them of a constitutional right while acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."). In addition, a plaintiff must allege how each defendant was personally involved in the events and occurrences giving rise to the claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (stating that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.); *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)). The court will address each of the plaintiff's claims.

1.      **Claims Against the Commonwealth of Pennsylvania for Money Damages**

Although the plaintiff names the Commonwealth of Pennsylvania as a defendant and seeks money damages among her several forms of relief, she has not plausibly alleged a cause of action for damages against the Commonwealth. In this regard, states, such as the Commonwealth of Pennsylvania, are not considered "persons" for purposes of section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ("[A] State is not a person within the meaning of § 1983."). Furthermore, the Eleventh Amendment bars suits against a state in federal court that seek monetary damages. *See Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought." (internal citations omitted)); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003) ("A state is generally entitled to immunity in federal court from suits by private parties, including their own citizens. This protection from suit extends to state agencies as well as state officials sued in their official capacities for monetary damages." (internal citations omitted)). The Commonwealth of Pennsylvania has not waived that immunity. *See* 42 Pa. C.S. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."). Accordingly, the claims for money damages the plaintiff seeks to assert against the Commonwealth of Pennsylvania may not proceed and will be dismissed with prejudice.

2.      **Claims Against Governor Shapiro and Michelle Henry**

The plaintiff also names as defendants Governor Shapiro and Pennsylvania Attorney General Michelle Henry, but presents no factual allegations linking either of them to her purported

constitutional violations. Without allegations of personal involvement, *see Rode*, 845 F.2d at 1207; *Dooley*, 957 F.3d at 374; *Iqbal*, 556 U.S. at 676, the court must dismiss the claims against Government Shapiro and Attorney General Henry for the failure to state a claim.[6]

### 3.   Additional Reasons Why Claims in Complaint Fail to State a Claim

At this point, the court has essentially completed screening the complaint under 28 U.S.C. § 1915(b)(2) and determined that the plaintiff does not have any viable claims against any of the three named defendants in the complaint. As will be explained later, the court will grant the plaintiff leave to amend her complaint should she be able to assert a plausible claim against an appropriate defendant. Should the plaintiff decide to file an amended complaint, she should be aware of the following deficiencies with these additional claims.

### a.   Right to Privacy Claims

As noted above, the plaintiff believes that the "State of Pennsylvania" violated her right to privacy under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721(a)(2), asserting that police in Pennsylvania must have "probable cause or reasonable suspicion to require [her] driver's license." Compl. at ECF pp. 5–6. The plaintiff also avers that "police officers took [her] driver's license information and recorded [her] vulnerable status in the DMV database" and, as a result, "the Pennsylvania DMV profiled [her] license." *Id.* Based on these allegations, the court understands the plaintiff to be asserting a claim under the DPPA against the Commonwealth of

---

[6] To the extent that the complaint can be construed to raise claims against Governor Shapiro and Attorney General Henry in their official capacities, any such claims are actually claims against the Commonwealth of Pennsylvania and would be subject to dismissal for the same reasons the court is dismissing the claims against the Commonwealth. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978))). Although a plaintiff may sue state officials in their official capacities where the plaintiff seeks prospective injunctive relief to stop an ongoing violation of federal law, *see Ex Parte Young*, 209 U.S. 123 (1908); *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002), nothing in this complaint can be interpreted as seeking prospective injunctive relief against Governor Shapiro and Attorney General Henry.

Pennsylvania and a general section 1983 claim for invasion of privacy. The court will address each in turn.

i.     *DPPA Claim*

Congress enacted the DPPA "as a public safety measure, designed to prevent stalkers and criminals from utilizing motor vehicle records to acquire information about their victims," and to stop "the States' common practice of selling personal information to businesses engaged in direct marketing and solicitation." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 944 (7th Cir. 2015) (quoting *Maracich v. Spears*, 570 U.S. 48, 57 (2013)); *see also Reno v. Condon*, 528 U.S. 141, 146 (2000) ("The [DPPA] also regulates the resale and redisclosure of drivers' personal information by private persons who have obtained that information ***from*** a state DMV." (emphasis added)). In light of these purposes, the DPPA generally provides that

> [a] State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity:
>
> **(1)** personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section . . . ."); or
>
> **(2)** highly restricted personal information, as defined in 18 U.S.C. 2725(4), about any individual obtained by the department in connection with a motor vehicle record, without the express consent of the person to whom such information applies, except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9) . . . .

18 U.S.C. § 2721(a) (internal footnote omitted).[7] As shown by these provisions, the Act's restrictions apply to a "State department of motor vehicles, and any officer, employee, or

---

[7] The DPPA defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(3). It also defines "highly restricted personal information" as "an individual's photograph or image, social security number, medical or disability information[.]" *Id.* § 2725(4).

contractor thereof." *Id.* Yet, despite the reference to a state's department of motor vehicles, the DPPA expressly precludes civil suits against states and state agencies. *See id.* § 2724(a) ("A *person* who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." (emphasis added)); *id.* § 2725(2) (defining "person" as "an individual, organization or entity, but *does not include a State or agency thereof*" (emphasis added)); *see also Rollins v. City of Albert Lea*, 79 F. Supp. 3d 946, 955 (D. Minn. 2014) (explaining that "while an individual may seek injunctive relief under § 1983 against a state official acting in his official capacity, the DPPA expressly precludes civil suits against states and state agencies," and citing *Heartland Academy Community Church v. Waddle*, 427 F.3d 525, 530 (8th Cir. 2005) for its "finding, in a § 1983 case, that there is an exception to sovereign immunity for state officials acting in their official capacity 'where the relief sought is prospective and not compensatory'"). Accordingly, the plaintiff's claims under the DPPA against the Commonwealth of Pennsylvania cannot proceed, and the court will dismiss them with prejudice.

ii.    *Section 1983 Claim for Invasion of Privacy*

In determining whether the plaintiff has plausibly pleaded a constitutional violation of a right to privacy, the court notes that she did not identify any specific constitutional amendment in the amended complaint. Nevertheless, the court will analyze her factual allegations to ascertain whether she has plausibly alleged that her rights under the Fourth or Fourteenth Amendments were violated.

Regarding the Fourth Amendment, it generally guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV. "The Fourth Amendment is violated when the state conducts an

unreasonable search or seizure that infringes upon a reasonable expectation of privacy." *Talley v.*

*Mazzocca*, 796 F. App'x 61, 63 (3d Cir. 2019) (per curiam) (citing *Katz v. United States*, 389 U.S.

347, 361 (1967) (Harlan, J., concurring)).[8] Although the Fourth Amendment is concerned with

protecting individuals' privacy, it

> cannot be translated into a general constitutional 'right to privacy.' Th[e Fourth]
> Amendment protects individual privacy against certain kinds of governmental
> intrusion, but its protections go further, and often have nothing to do with privacy
> at all. Other provisions of the Constitution protect personal privacy from other
> forms of governmental invasion. But the protection of a person's general right to
> privacy—his right to be let alone by other people—is, like the protection of his
> property and of his very life, left largely to the law of the individual States.

*Katz*, 389 U.S. at 350–51 (internal footnotes omitted).

Here, it appears that the plaintiff voluntarily provided her driver's license information to a

police officer after she had phoned the police department and requested assistance during her

eviction. *See* Compl. at ECF p. 5 ("When I called the Lehighton police on December 12th to

request a police escort to remove my belongings from the housing, police officers took my driver's

license information and recorded my vulnerable status in the DMV database."). Under these

---

[8] A search, in the criminal procedure context, has been defined as:

> An examination of a person's body, property, or other area that the person would reasonably be
> expected to consider as private, conducted by a law-enforcement officer for the purpose of finding
> evidence of a crime. • Because the Fourth Amendment prohibits unreasonable searches (as well as
> seizures), a search cannot ordinarily be conducted without probable cause.
>
> > "It must be recognized that whenever a police officer accosts an individual and
> > restrains his freedom to walk away, he has 'seized' that person. And it is nothing
> > less than sheer torture of the English language to suggest that a careful exploration
> > of the outer surfaces of a person's clothing all over his or her body in an attempt
> > to find weapons is not a 'search.'" *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868,
> > 1877 (1968).

Search, Black's Law Dictionary (11th ed. 2019). A "seizure" has been defined as "[t]he act or an instance of taking
possession of a person or property by legal right or process; esp., in constitutional law, a confiscation or arrest that
may interfere with a person's reasonable expectation of privacy." Seizure, Black's Law Dictionary (11th ed. 2019).

circumstances, the plaintiff "has no legitimate expectation of privacy in information [s]he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979). In addition, courts analyzing privacy standards under the Fourth Amendment in the context of driver's license information have concluded that there is no legitimate expectation of privacy in such information. *See, e.g.*, *Caldwell v. City of Newfield*, Civ. A. No. 05-1913, 2007 WL 1038695, at *4 (D.N.J. Mar. 30, 2007) (rejecting claim that police officer violated plaintiff's Fourth Amendment rights when officer obtained information about him from police dispatcher because "[p]laintiff had no expectation of privacy in information already possessed by the government. There is no reasonable expectation of privacy in publicly available information on [p]laintiff, his driver's license, and his vehicle's registration. Moreover, the information requested was information that belonged to the state[,] not [p]laintiff. The state issued his driver's license and his vehicle registration. The state would also have issued any legal process such as warrants for arrest. Simply, the information sought and obtained was not private or confidential and belonged to the state, not [p]laintiff" (citations omitted)); *Scheetz v. Morning Call, Inc.*, 946 F.2d 202, 206–07 (3d Cir. 1991) ("We conclude that the information contained in a police report is not protected by the confidentiality branch of the constitutional right to privacy. . . . When police are called, a private disturbance loses much of its private character."); *Holder v. City of Allentown*, 151 F.R.D. 552, 554 (E.D. Pa. 1993) (concluding that "[b]ecause plaintiff could have no reasonable expectation of privacy in the address listed in his motor vehicle registration records—which is of public record and available to anyone who requests the information—he has not stated a cause of action for the infringement of his right to privacy under either the United States Constitution or Article I, Section 1 of Pennsylvania Constitution" (citations omitted)). Accordingly, the plaintiff has not plausibly pleaded a claim for a violation of a right to privacy under the Fourth Amendment.

Turning now to the Fourteenth Amendment, the law applicable to claims about purported violations of a constitutional right to privacy under this amendment is as follows:

> "The United States Constitution does not mention an explicit right to privacy and the United States Supreme Court has never proclaimed that such a generalized right exists." *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 178 (3d Cir. 2005). *But see Sterling v. Borough of Minersville,* 232 F.3d 190, 193 (3d Cir. 2000) (stating that the Supreme Court "acknowledged the individual's constitutional right to privacy" in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). The Supreme Court, however, has found certain constitutional "zones of privacy." *C.N.,* 430 F.3d at 178 (citing *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). From these zones of privacy, we have articulated two types of privacy interests rooted in the Fourteenth Amendment. *Nunez v. Pachman,* 578 F.3d 228, 231 n.7 (3d Cir. 2009); *see also Malleus v. George,* 641 F.3d 560, 564 (3d Cir. 2011); *C.N.,* 430 F.3d at 178. The first privacy interest is the "individual interest in avoiding disclosure of personal matters," and the second is the "interest in independence in making certain kinds of important decisions." *C.N.,* 430 F.3d at 178; *see also Malleus,* 641 F.3d at 564; *Hedges v. Musco,* 204 F.3d 109, 121 (3d Cir. 2000). The first privacy interest is at issue in this matter.

> "'The right not to have intimate facts concerning one's life disclosed without one's consent' is 'a venerable [right] whose constitutional significance we have recognized in the past.'" *C.N.,* 430 F.3d at 179 (quoting *Bartnicki v. Vopper,* 200 F.3d 109, 122 (3d Cir. 1999)). Justice Brandeis, in dissent, famously referred to this as "the right to be let alone." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

> The touchstone of constitutional privacy protection is whether the information at issue is "within an individual's reasonable expectations of confidentiality." *Malleus,* 641 F.3d at 564; *see also C.N.,* 430 F.3d at 179; *Fraternal Order of Police, Lodge No. 5 v. City of Phila.,* 812 F.2d 105, 112 (3d Cir.1987) ("*Fraternal Order of Police*"). The more intimate or personal the information, the more reasonable the expectation is that it will remain confidential. *Fraternal Order of Police,* 812 F.2d at 112–13 (citing *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 & n. 5 (3d Cir. 1980)); *see also Malleus,* 641 F.3d at 564; *C.N.,* 430 F.3d at 179. Indeed, the "federal constitution ... protects against public disclosure [of] only highly personal matters representing the most intimate aspects of human affairs," thereby shielding from public scrutiny "only that information which involves deeply rooted notions of fundamental personal interests derived from the Constitution." *Nunez,* 578 F.3d at 232 (emphasis omitted) (citation and quotation marks omitted).

> We have found the following types of information to be protected: a private employee's medical information that was sought by the government; medical,

> financial and behavioral information relevant to a police investigator; a public
> employee's prescription record; a minor student's pregnancy status; sexual
> orientation; and an inmate's HIV-positive status. *Malleus,* 641 F.3d at 565 (citing
> cases and explaining that information encompassed by the constitutional right to
> privacy may be separated into categories reflecting sexual, medical and some
> financial information).

*Doe v. Luzerne County*, 660 F.3d 169, 175–76 (3d Cir. 2011).

As to any Fourteenth Amendment invasion of privacy claim, the plaintiff has only alleged that "police officers took [her] driver's license information and recorded [her] vulnerable status in the DMV database." Compl. at ECF p. 5. She does not specifically identify the officers or the department for which they were employed, what information was allegedly recorded, or whether she had a reasonable expectation of privacy in what was allegedly recorded. To the extent that the plaintiff is referring to the typical information contained on one's driver's license, she has failed to state a plausible claim for a constitutional violation. *See Mallak v. Aitkin Cnty.*, 9 F. Supp. 3d 1046, 1062 (D. Minn. 2014) ("No case has yet found that a constitutional right to privacy exists under the Fourth or Fourteenth Amendment for the type of information typically found in driver's licenses and protected by the DPPA (address, color photograph, date of birth, weight, height, and eye color)." (citations omitted)); *see also Rasmusson v. Chisago Cnty.*, 991 F. Supp. 2d 1065, 1074–76 (D. Minn. 2014) ("In this case, Plaintiff alleges a privacy interest in her driver's license information [under the Fourteenth and Fourth Amendments]. However, the only information Plaintiff claims was accessed through her driver's license record was her address, color photograph, date of birth, weight, height, eye color, driver identification number, and driving record. With the exception of Plaintiff's driving record, all of this information is included on the face of a driver's license, and individuals show their driver's licenses to strangers on a daily basis. Moreover, much of this information can be obtained by looking at an individual or by reviewing public records. Thus, the disclosure of this information cannot be considered shockingly degrading

or egregiously humiliating. Nor could Plaintiff, based on the public nature of this information, legitimately expect that it would remain confidential. Accordingly, . . . this information does not warrant constitutional protection because an individual does not have a legitimate expectation of privacy in it."). Therefore, any claims that the plaintiff seeks to assert arising from the alleged accessing of her driver's license information, and the disclosure of that information under either the Fourteenth or Fourth Amendments, are implausible. Consequently, the court will dismiss them for the failure to state a claim.

  b. <u>Claims Under the Health Insurance Portability and Accountability Act</u>

   To the extent that the plaintiff seeks to bring claims under HIPAA, that Act does not provide for a federal private right of action. *See Johnson v. WPIC*, 782 F. App'x 169, 170–71 (3d Cir. 2019) (per curiam) ("[A]s the District Court explained, HIPAA does not create a private right of action." (citing *Acara v. Banks*, 470 F.3d 569, 571–72 (5th Cir. 2006))); *Wassef v. Tibben*, 68 F.4th 1083, 1089 (8th Cir. 2023) ("HIPAA imposes civil and criminal penalties for unauthorized disclosure of medical information and grants the Secretary of HHS authority to seek those penalties. *See* 42 U.S.C. §§ 1320d-5, d-6; *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006). The Fifth Circuit in *Acara*, 470 F.3d at 572, and every other circuit to consider the question, have held that there is no implied private right of action for HIPAA violations because this specific grant of enforcement authority reflects congressional intent to preclude private enforcement."); *Baum v. Keystone Mercy Health Plan*, 826 F. Supp. 2d 718, 721 (E.D. Pa. 2011) ("There is no federal private right of action under HIPPA [sic]." (citations omitted)). Accordingly, the court will dismiss with prejudice all claims in the complaint in which the plaintiff asserts HIPAA violations.

c.    Claims Concerning the Seizure of the Plaintiff's Vehicle

The plaintiff asserts that the "State of Pennsylvania violated [her Fourth] Amendment constitutional right to be free from unreasonable search and seizure of [her] personal belongings and privately-owned vehicle on December 19, 2022." Compl. at ECF p. 7. Her assertion is based on the allegation that after DMV records indicated her location and vulnerable status, her car was illegally seized and towed from the parking lot of a public library in Allentown, Pennsylvania "without any due process or reasonable suspicion of a crime having been committed." *Id.* These allegations are insufficient to plead a plausible Fourth Amendment claim.

"The impoundment of an automobile is a Fourth Amendment seizure." *Draper v. Darby Twp. Police Dep't*, Civ. A. No. 10-1080, 2012 WL 93178, at *2 (E.D. Pa. Jan. 11, 2012); *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) ("The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment."). "As a general rule, a law enforcement officer may only seize property pursuant to a warrant based on probable cause. Police may, however, exercise discretion to impound a vehicle 'so long as that discretion is exercised according to standard criteria.'" *Draper*, 2012 WL 93178, at *2 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)). To determine if law enforcement violated the Fourth Amendment, the court "consider[s] the existence of probable cause via a 'common sense approach' based on the totality of the circumstances, and viewed from the perspective of an objectively reasonable police officer." *Young v. City of Pittsburgh*, 562 F. App'x 135, 140 (3d Cir. 2014) (internal citation omitted); *see also United States v. Smith*, 522 F.3d 305, 311–15 (3d Cir. 2008) (analyzing whether police officer's impoundment of vehicle violated Fourth Amendment by examining reasonableness of police officer's actions). The standard is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had

committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). Probable cause exists if "at the moment the arrest was made . . . the facts and circumstances within [the officer's] knowledge and of which [they] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing" that the plaintiff had violated the law. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

In this case, the plaintiff has provided very few factual allegations about her unreasonable seizure claim and, as such, she has failed to plead a plausible Fourth Amendment claim. In this regard, the plaintiff has not specifically identified the individuals involved in the seizure, and she has not alleged that they acted without regard to standard criteria when they arranged for her car to be towed. Additionally, the plaintiff fails to include any factual allegations regarding the reason the vehicle was towed, or which person or entity directed that her vehicle be towed in the first instance. In fact, it is unclear from her allegations whether her vehicle was towed by the police, or whether it was repossessed by a different entity. *See* Compl., Ex. A, Doc. No. 2-1 (indicating that plaintiff owed $13,506.96 under terms of her contract resulting from repossession and sale of her 2017 Buick Verano on March 9, 2023).

In addition, to the extent that the plaintiff is attempting to assert a claim for a procedural due process violation, the court recognizes that the Due Process Clause of the Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a plausible procedural due process claim, a plaintiff must allege that "(1) [they] were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to [them] did not provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (citation and internal quotation marks omitted).

Here, the plaintiff appears to assert a constitutionally cognizable property interest in her vehicle. *See Santiago v. City of Chicago*, 446 F. Supp. 3d 348, 357 (N.D. Ill. 2020) ("The parties here do not dispute that the City deprived Santiago of a property interest in her vehicle when it towed her van."); *see also Goard v. Crown Auto, Inc.*, No. 15-CV-35, 2017 WL 2423521, at *5 (W.D. Va. June 2, 2017) ("As the individual who actually towed the Plaintiff's vehicle, Snyder undoubtedly deprived Plaintiff of her property interest in her vehicle."). She also alleges that she was deprived of the vehicle without any due process. *See* Compl. at ECF p. 7. These facts alone are insufficient to state a plausible procedural due process claim because even though the plaintiff had a protected property interest in her vehicle, she has failed to allege that "the procedures available to [her] did not provide due process of law." *Hill*, 455 F.3d at 234 (citation and internal quotation marks omitted); *see also Mader v. Union Twp.*, No. 22-1425, 2022 WL 17546953, at *2 (3d Cir. Dec. 9, 2022) ("To the extent that the Maders have alleged a procedural-due-process claim, they have failed to show that the procedures available to them—which included both an opportunity to make their case in person to the Township and then, if necessary, to seek relief in state court—was constitutionally inadequate." (citations omitted)); *Willard v. Pa. Soc. for the Prevention of Cruelty to Animals*, 525 F. App'x 217, 221 (3d Cir. 2013) (affirming dismissal of complaint where plaintiff failed to allege that, *inter alia*, available procedures were inadequate). In addition, it does not appear that the plaintiff alleges that she availed herself of the processes available to her upon the impoundment of her vehicle. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("A due process violation is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what [they] want[]." (citation and internal quotation marks omitted)); *see also*

*Frompovicz v. Hissner*, 434 F. Supp. 3d 269, 279 (E.D. Pa. 2020) (concluding defendants were entitled to summary judgment on plaintiff's procedural due process claim because plaintiff failed to avail himself of process available to him). Accordingly, the plaintiff has failed to plead a plausible procedural due process claim, and the court will dismiss it without prejudice.

d.      Factually Frivolous Claims

As already discussed, the plaintiff alleges that following the seizure of her vehicle, she has been forced to stay in emergency shelters and has been stalked by individuals who "contaminate[d] her] DNA with deadly viruses" and bacteria. *See* Compl. at ECF pp. 9–11. She also alleges that her abdomen and buttocks were inserted with "illegal electronic or medical devices," she was a "victim of attempted human trafficking," and she "suffered numerous attempts to sell [her] original DNA to drug cartels . . . [and] an undercover FBI agent." *Id.* The plaintiff believes that "some of [her] original DNA is currently being stored illegally in a freezer" and that certain service organizations have been "conspiring with 'Street Medicine of the Lehigh Valley Network' to supply human DNA to Johnson and Johnson and Baxter pharmaceuticals for the purpose of conducting medical experiments on human subjects without consent or compensation." *Id.* She also avers that staff members have accessed her personally identifiable information in order to "contaminate [her] DNA with deadly bacteria, . . . injure [her] spine and legs while [she] was taking a shower, . . . repeatedly commit financial fraud . . . and even attempted to access the private medical information of [her] genetic descendants in order to injure them as well." *Id.* at ECF p. 12. These allegations are wholly incredible and lack a basis in fact.

"[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible . . . ." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). This finding also requires the court to dismiss these allegations as factually baseless. *See, e.g.*, *Price v.*

*FBI*, Civ. A. No. 20-CV-3015, 2020 WL 4368063, at *3 (E.D. Pa. July 30, 2020) (concluding that *pro se* plaintiff's allegations were factually frivolous where plaintiff alleged that "numerous law enforcement agencies, attorneys, prison officials, and medical professionals have used neurological and psychological technology to control the 'four basic groups of his brain and mental functions' beginning in June 1978 and continuing through the present," and "that the use of this 'technology' and 'mind control' has caused him numerous impairments and drove him to criminal and erratic behavior"); *Caterbone v. Nat'l Sec. Agency*, 698 F. App'x 678, 679 (3d Cir. 2017) (per curiam) (dismissing appeal as lacking an arguable basis in fact where underlying allegations were based on *pro se* plaintiff's assertion that he was "victim of U.S. sponsored mind control and cointelpro harassment program"); *DeGrazia v. FBI*, 316 F. App'x 172, 172 (3d Cir. 2009) (per curiam) (concluding that complaint was factually frivolous where *pro se* plaintiff alleged that "at the age of four, he was the victim of a government-run, Nazi designed genetic experiment which caused his body to combine with reptile DNA, and that he has since experienced harmful side effects which pose a threat to others"); *Dodson v. Haley*, No. 16-6196, 2017 WL 3224485, at *1 (6th Cir. May 17, 2017) (affirming district court's dismissal of action for being frivolous where *pro se* plaintiff "alleged that correctional officers and family members of the victim whom he was convicted of murdering installed 'eye cameras' and 'thought-processing devices' in his body that permitted the defendants to read his legal mail and monitor his food so that they could tamper with it"); *Bordages v. United States Just. Dep't*, No. 15-2708, 2015 WL 9267086, at *3 (W.D. Tenn. Nov. 5, 2015) ("The allegations that the federal government conspired with a private corporation and a United States District Judge to steal Bordages's DNA, genetics, and stem cells using a nano probe and to perform unauthorized medical experiments on him are factually frivolous."), *report and recommendation adopted*, No. 15-2708, 2015 WL 9295994 (W.D. Tenn. Dec. 18, 2015).

### III.    CONCLUSION

As set forth above, the court will grant the plaintiff leave to proceed *in forma pauperis*, but will also dismiss the complaint in its entirety. Concerning this dismissal, the court will dismiss with prejudice any claims for monetary damages or claims under the DPPA the plaintiff sought to assert against the Commonwealth of Pennsylvania because they are implausible and the defects in those claims cannot be cured. *See Grayson v. Mayview St. Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002) (stating general rule that court should grant leave to amend unless doing so would be futile); *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested— when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."). The court will also dismiss with prejudice any claims the plaintiff sought to assert under HIPAA because there is no private right of action for damages under that Act. The court will further dismiss any claims based on the factual allegations the court identified above as being factually frivolous. As for the remainder of the complaint, the court will dismiss any remaining claims without prejudice for the failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii). Since the court at this time cannot state that the plaintiff cannot cure the defects the court has identified in those remaining claims, the court will grant the plaintiff leave to file an amended complaint.

The court will enter a separate order.[9]

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

[9] This order will provide further instruction to the plaintiff about filing an amended complaint.